Alright, Hitt v. CSX Good morning, Mr. Burge. I see you're still suing the railroads. Trying to. And we ran into an obstacle here, not in the suing part, but in getting to the jury part. And this is a case under the Federal Railroad Safety Act. The provisions that prohibit retaliation for refusing to do work under unsafe conditions. And this is about the lightning storm, but that acts under Air 21, so it's not McDonald Douglas. And what the district court did is it said you can't prevail under a cat's paw under your facts because the person who set up this tough test, expecting the employee to fail, didn't know who the employee was. Yeah, that really comes down to this fourth element of the prima facie case, doesn't it? It really does. I mean, he doesn't really know, though, who it is until after he's already set it up, right? No, I don't agree with that. How does he know? How does he know beforehand? I mean, he's already decided he's going to administer the tough test. And it may be that afterwards he hears this voice that he may or may not be familiar with, okay? The jury might have a question about that. But I don't see how there's any evidence that he knew beforehand who had been selected for the test. Well, we have a number of factors. The radio is certainly one of them because the radio disproves. But that's after the fact. Well, if you look at the page 7 of the hearing transcript where he says, I'm listening to the radio and I hear the Y293, he doesn't say I turned the radio on. I mean, he's had the radio. And this is a case in which his claim at his first deposition and at the hearing is that at 7 o'clock at night, as part of a test team, I get to Birmingham and I go to a yardmaster and I ask a yardmaster, where can I set up a banner test? And he says, well, I've got somebody coming in to track six. And so he goes over there and sets it up. That is his theory. And what we have is that he didn't get there at 7. He got there at 4. In his second deposition, confronted with his telephone record, show that he's pinging off the tower at Birmingham. He goes, well, maybe I did get there at 7. So he's been there while this gentleman's been working for four hours. So he's been there for three hours and the employee's been there for four. You said in your blue brief at page 34 that Smith listened to the radio. You don't argue that Smith listened to the radio until after he set up the test. They don't. To set up the test. We know that. He's going to do a banner test. That's what he says. And he says that he set it up by himself based on talking to the yardmaster. Then we have the text message. And the text message he's sending to an out-of-state supervisor and saying that, well, Josh and I have one set up. Josh is the train master hires. Train master hires is the immediate supervisor of Mr. Hitt, who's been in charge of him all day since he got there at work. And they're saying, well, we don't have any idea who it is. We don't have anything, though, that Josh told him that that's who's going to do it. That's right. Now we're talking about inferences, looking at everything and taking all inferences in the favor of the non-movement. But you didn't ask Josh. Did you tell him that? We did ask Josh. Josh says, I don't remember. Okay. I don't remember being there. I know nothing. Okay. I don't want to be here. That was his. How do we know, then, that he knew who was going to be doing the test? Well, we have a supervisor who has animus toward him. The only event that he ever recalls with this gentleman is when he refused to go out and work in the lightning storm around all kinds of metal. And twice, this supervisor says, you know what? If you don't go out there, I'm relieving you. So we have anger. We have animosity. We have that he does not work at this location on other occasions. He was here in the office a few days before, right? Right. The court said, oh, this is just a normal, ordinary test. This is just business as usual. This particular manager has never – The Department of Smith testifies, does he not, that he did not know who he was testing? His testimony, and we spelled it out in our brief at some length, if you look at the entirety of his testimony, is that I don't really remember much of that day. Before coming to this deposition, what I did is I read the hearing transcript. And reading the hearing transcript, I see that I got there at 7 o'clock, I talked to a yardmaster, I set up a test. And he says, I would have never had a reason to ask the yardmaster who was on the job. That's not how I performed my test. Right. And he says he's going off his past pattern, how he typically does things. But two questions before, at the bottom of the page immediately before that, he says, I have – oh, I didn't know who it was. And I say, well, hold on now. You didn't remember doing any tests. You didn't remember who you tested. You didn't remember who you were with. You didn't remember this. You didn't remember that. A minute ago, you didn't remember anything. How is it that all of a sudden you have this memory? And he's walking it back. He's walking it back saying, well, that's not how I typically do things. I talked to the yardmaster. So I say, well, who was this yardmaster? And he says, well, I don't know who the yardmaster was. Well, was it a man or was it a woman? Can we at least do that? No, I can't tell you that either. I think that the jury, looking at all of these facts, that he has not told the truth about when he got there. He's not told the truth about who he was with. He said he set it up by himself, that he was a test team of one. And then we move into federal court and we start getting some discovery. And we find out that none of the stuff he's told is true. And a jury could reject his testimony and say that he made it up out of whole cloth. I think they likely would. But the problem is, in terms of a jury, that's right, I think. But for summary judgment purposes, you can't rely on the principle that someone's not telling the truth to create an issue of fact. Or at least generally you can't. You need some affirmative evidence on your part. And you think that there's just enough circumstantial evidence and reasonable inferences drawn to point to the fact that Smith knew that your client was going to be the employee on duty for the banner test. Right. Why would we set it up at the sharpest curve in the yard, what he believes to be the sharpest curve in the yard? Sending a text message saying, hey, do I get to pull this employee out if he fails? We set up a tough test. If he hits the banner, do I get to pull him out of service? He's checking that. So he already is planning, I'm going to get this guy. And then he gets the answer. Go ahead, finish, finish, and I'll ask the question. Then he gets the answer no. And he says, well, it's a serious, right? Well, in context, it being a serious is important because four days earlier this same person has been the hearing officer at a Step 2 investigation of Jeremy Hitt, knows that one more serious and he's out. Or he's subject to being out. And so that puts the whole thing in context. He says, the employee we are testing, he says in the hearing transcript, I know it's the one 293, that's a one-man job. Jeremy Hitt's the only person working on it. Do we have evidence that he knows that beforehand? We have evidence in the hearing transcript that he says that I asked for the yardmaster. And, again, it's our position. Nobody even needs to believe that. But that he said, well, I've got a train pulling out of this one track, track six. I'm going to be sending the 293 in there. We have him listening to the radio, and he hears who it is. And he testifies, I didn't know until, you know, I don't know this stuff until, you know, he pulls up. I had no idea who I was testing. Well, that's just not the truth. What does the record reflect about how often these banner tests were conducted? Well, the court said that they were routinely done. I know, but you take issue with that. Well, because the citation that the court gives is to a 30B6 designee named Witt, and it doesn't say that they are routinely done. It says Witt doesn't say anything about the frequency of the test. Mr. Hitt testified that maybe once a year. So, if anything, it's infrequent. And how often the people who are supervising RCOs do them, that's one thing. But Mr. Hitt, or excuse me, Trainmaster Smith, he's never done one. He's never tested, gone out and banner tested an RCO. We have his. I think you probably have enough to serve. If the case all boils down to the question of whether or not a reasonable jury could find that Mr. Smith knew that your client was the employee on the job for the banner test, my personal opinion is you probably get to a jury. Yeah, no doubt about that. I'm with you on that. And the inferences are supposed to be flowing our way. Yeah, but the problem is I just don't see anything in the record that says that he knew it before he set up the test. It's the timing problem. It's totally the timing problem. Your theory depends on a targeting of Hitt. And I just don't see that. Your argument is that it's just too good to be true, right? That Mr. Smith was presiding over the hearing. It's all a coincidence is their point. That this thing is conducted once a year, and it happens to be conducted for your client. It happens to be conducted on the sharpest turn where people are likely to fail. It happens shortly after Mr. Smith presides over a hearing at which your client has a Step 2 issue and so forth and so on. It's just too much. It happens when that's not even one of the tests to be performed that quarter. And it requires an interpretation, right? I mean, he didn't actually hit the banner. So he did know, the supervisor did know who it was when he was interpreting the rule to say using the emergency brake violates the test, right? Oh, absolutely. At that point. And we'd have to reserve the remainder of our time unless you have further questions now. Okay. Thank you, Mr. Burge. Dr. Sciabatta? Did I pronounce it correctly? Yes, that's correct, Your Honor. Thank you. And may it please the Court, Judge, the district court's summary judgment opinion in CSX's favor should be affirmed because there's simply, for one reason, no evidence of a setup here. Can we say it should be reversed because it's just too good to be true when you consider all the facts together? No, you can't, Judge, because, for one thing, I think as far as the radio communications go, as you noted, the testimony at the hearing, which predated the dismissal, it predated the lawsuit, was that he doesn't start listening to the radio communications until after he has already set up the test. So if he doesn't know who he's testing at the time he sets up the test in this sharp curve, you know, how could it possibly be a setup? And with respect to the frequency of the test, Judge Jordan, you posed a question to opposing counsel. The evidence, Mr. Hitt admitted in his deposition that these are common tests. He admitted in his deposition that Banner tests are a focus of operational testing. There's certain rules that they focus on. But the people on your side of the case don't say that. Well, Your Honor, I would point you to the interrogatory response. He's not the one conducting those tests. They're being conducted on people like him. Well, Judge Jordan, I would point you to CSX's interrogatory response, which is in the record at document 14-4 at page 109. That interrogatory response shows that in the two years prior to the Banner test, Nick Smith performed Banner tests on at least 21 days. So that's just one manager. And Mr. Hitt's testimony was that I myself am Banner tested about once a year. There's evidence in the record, the superintendent who was involved in the discipline decision, Mike Dilday, testified that there's about 1,500 employees in his division. So if you extrapolate Mr. Hitt's testimony that I'm Banner tested once a year across all of those people, then certainly it leads to the conclusion that this is a frequent test. And I think where opposing counsel took issue with respect to the deposition testimony was the follow-up question was, how often do you see people in the yard getting tested? And that's where Mr. Hitt said, well, it's not all that often. But just because he's only on duty, he's not on duty all the time, obviously. He's on duty for one shift, even the days that he's working. Was he asked at the 30B6 deposition about the frequency of the Banner test or not asked that question? I don't believe that. So the 30B6 witness on that topic was Joseph Witt, and I don't believe he was asked that question. But what I would say is there was a system notice published. This is referenced in the briefing. And we don't dispute that a Banner test was not one of the required tests for the first quarter of 2019. But there are operational testing guidelines. It's a written program that's in place. And that program says that in addition to the minimum requirements, also test locomotive operators on operating at a speed that permits stopping within half the range of vision. And so that's what the Banner test does. That's what it tests for. So who failed Mr. Hitt on the Banner test? That was Nick Smith. Isn't that part of the whole mosaic, especially when there is at least an argument, as Judge Brasher alluded to, that he may not have failed the test pursuant to the letter of the regulations and rules? Well, Judge Jordan, I think the important factor here is the fact that he failed the test based on an undisputed fact, which is the use of the emergency brake. But the instructions, again, viewing the evidence in the light most favorable to him at summary judgment, I thought that the instructions, CSX's own instructions, just required the train be stopped short of the device and did not specify a method of braking. Am I wrong? You're correct that it does not explicitly specify a method of braking. But all of the decision makers who were involved in the decision to dismiss him testified consistently that we have always interpreted this rule to mean that if you have to use the emergency brake to stop, then you're going too fast. And so that's where there's no evidence of disparate treatment. Mr. Hitt has not pointed to a single employee who used the emergency brake to stop for a Banner test and was not disciplined. And then conversely, CSX has pointed to seven different employees who got disciplined and in some cases dismissed for the exact same thing that Mr. Hitt did, which was using the emergency brake to stop during a Banner test. But here the standard is contributing factor, right? Correct. This is not a typical McDonnell-Douglas burden-shifting analysis, right? That's correct, Your Honor. So why doesn't that contributing factor test, which is more favorable to an employee, get him home to a jury? Well, because I think the pretext still comes into play even with the contributing factor analysis. Now, you could have a decision that is retaliatory based on an honest belief that the person violated a rule, and our position is not that. Just because you have an honest belief under the contributing factor standard, that's enough. But it's certainly relevant, and it's certainly a relevant consideration that can be taken into account by the court in terms of determining whether or not this was retaliatory. One other thing I would say with respect to, you know, from our position. If everybody, if all of the supervisory personnel at CSX, the relevant people, testified that using the emergency handbrake would cause you to fail the Banner test, was that understanding of CSX's rules communicated to employees like Mr. Hitt? Well, I think there's a dispute, I think, over that. I think that he says, you know, he would say that it was not. All of the decision makers would say, look, we've always had that understanding, and there's record evidence that shows that that's the truth. That, you know, again, he has not pointed to anybody who engaged in this conduct who was not disciplined. Can I get you to talk about the radio issue again? Yes. It's undisputed that the supervisor was listening to the radio and I think knew the particular train he was going to test. Why isn't an inference from that that he was listening to the radio such that he knew was on that train? Yeah, Judge Berger, I think for two reasons. One, if you look at the hearing testimony, which again is the testimony that predates the lawsuit, he's not listening to the radio communications until after he has already set up the Banner in the track. So I think that's one thing. And then for the second thing, Hitt himself admits that this is not a job that he worked all the time. He says, sometimes I worked the Y193, which would be the first shift job. Other times I worked the Y293. And as Judge Pryor noted, there's no evidence, you know, to the extent they've tried to link this to Josh Hyers, the other manager who was on duty, there's no evidence, one, that Hyers knew that Hitt was on duty. But even if you assume that he did and grant him that inference at summary judgment, there's no evidence whatsoever that Hyers communicated that to Hitt. And that's something they could have asked Hyers in his deposition. They could have said to Josh Hyers, did you tell, you know, did you set up the Banner test? They did ask that question, and he said, I don't recall. There was never the question asked, though, you know, did you know Hitt was working that day? Did you ever convey that to Nick Smith? They didn't ask that question, and they certainly could have done that. So explain this to me. I mean, I just don't understand how this operation works. But, I mean, it seems odd to me that there would be a supervisor on site and he doesn't know who's driving these trains around. I mean, could you explain why that makes sense? Yeah, because, Judge, I think if you look at it in the whole context, so Nick Smith testified at the hearing that he was part of an operational test team that day. So what that means is you've got a group of managers, and there's testimony in the record it's at least three people, and they start the day on what they call the Birmingham Mineral Subdivision, which is Nick Smith's territory. And there's evidence in the record, including from Don Boyles, the 30B6 witness, that the plan all along was to work their way back towards Birmingham and, you know, continue the testing, progressing towards Birmingham. So that's why he's there that day. You know, the evidence is in the record that this is not his normal territory. So if he's on site there, he hasn't been on site the entire day. He spends most of the day, as reflected, I believe it's email exhibit to Don Boyle's 30B6 testimony, he spends most of the day outside of the Birmingham terminal. So he's not, you know, at that point he has no reason to even see who's on duty. And then when you get inside the yard, as he testified at the hearing, his typical practice is he just wants to know where crews are working so that they can set up the test. He doesn't care who it is. You know, he testified based on, we would say, personal knowledge, that his practice is not to ask, you know, which employee is coming into this test. And I'll also note that, you know, Jeremy Hipp put in a declaration at summary judgment. He never says, you know, in his declaration, hey, I was identifying myself by name over the radio. These guys are calling each other Y293. That's what they're saying. So that's what he's hearing. And at some point it just becomes too speculative to get to the point, you know, where a reasonable juror could infer that he knows who's getting tested. There's a separate question, too, that I just want to bring up in terms of if he knows who's being tested, is that enough to get to a jury? And we would argue that it is not. On the cat's paw theory, which is referenced in the brief, the appellant makes a statement in the reply brief to the effect that if he could show that but for the biased banner test, then the dismissal would have never happened, then the cat's paw theory, you know, prevails. So, in other words, if you could show but for causation, then you could prevail under a cat's paw theory. And that is not consistent with this Court's law. If you look at the law of this circuit, it uses phrases like where the decision makers effectively treat, you know, put a rubber stamp on the decision, then certainly that's a case where the bias of a subordinate could be imputed to the employer. But in this case, it was not a rubber stamp. Again, he's being dismissed on the basis of an undisputed fact, and I think that's a very important point here. I know, but here you're dealing with a very different, well, I shouldn't say very, but you're dealing with a different statutory regime, right? The normal cat's paw theory comes up, for example, in Title VII cases, which operate under, generally operate under the McDonnell-Douglas burden-shifting test. Here you've got a statute that, as a substantive matter, requires only that the retaliation be a contributing factor, right? That's correct, Your Honor. And then it says in 42121B2DII that the employer can then prove by clearing convincing evidence that it would have taken the same unfavorable personnel action in the absence of the protected behavior. So I get that, and I understand why you're focusing on our use of the cat's paw in other scenarios. I'd do the same thing because there's just nothing out here under this statute. But the regime, it's worded differently. The substantive liability is a little easier for a plaintiff, and the pretext analysis is sort of not something that the courts have baked into the statute, but it's actually in the statute itself. So we're going to have to figure out, I think, how to apply cat's paw analysis to this statutory scheme. Yes, I understand that. That's how I'm trying to think about it. Yeah, I understand that, Judge. And I think one thing that might be helpful to think about in that regard is there's a decision from this circuit, Antirio v. City of High Springs, 762 Federal Appendix 891. And there, again, it's, I believe, a motivating factor law in that case. But when they get to the point where they're trying to decide whether or not the subsequent investigation breaks the causal chain, they look at whether or not the decision of the decision maker was, quote, entirely justified apart from the biased recommendation. And so here we would argue that that entirely justified standard could be imported to a contributing factor law because it essentially excludes other facts that might be playing into that analysis. And one last thing with respect to the affirmative defense, you know, obviously Judge Proctor, in his opinion, said that if essentially, as I read it, but if you find that the banner test was retaliatory, then CSX can't prevail on the affirmative defense or it at least gets to a jury because then it comes down to a credibility determination. And we would respectfully disagree with that, pointing to the Supreme Court's recent opinion in Murray v. UBS Securities, which postdates the summary judgment opinion. And there, I think it's evident from a hypothetical the Supreme Court poses in that case that just because you could show that but for the protected conduct, the discipline wouldn't have happened, that's not enough to defeat the affirmative defense. Let me make sure I've got everything you've got in support of your argument about the affirmative defense. You say it's consistent with previous discipline. Between May 2016, January 2020, your client disciplined at least seven employees who, like Hitt, used the emergency break to stop during the banner test, right? Correct, Your Honor. Within eighteen months of Hitt's dismissal, CSX dismissed at least five other employees found to have committed three serious offenses in less than three years, right? Correct, Your Honor. And Hitt's protected activity occurred several months before the alleged retaliation and Hitt's dismissal was decided by managers who did not know of his protected activity, right? That's correct. Is that it? I think it's also the fact that it's use of the emergency break, it's undisputed that that has led to discipline in other cases. I guess that's baked into the comparator analysis. But the Supreme Court phrased the question, this is what they said with respect to the affirmative defense, the question is whether the employer would have retained an otherwise identical employee who had not engaged in the protected activity. My question to you, Mr. Schiff, you're over your time. It was a simple question about the record. Is there any other evidence on the affirmative defense that we need to know about? I think you've summed it up, Your Honor. Thank you. Mr. Birch. Your instincts are correct that a supervisor is going to know about the people who are working. Hires denies any knowledge of that day. I just don't remember anything. But he's testified as to how he operates. And he spends his time watching monitors that have cameras throughout the yard. And he's testified that he listens to the radio like all train masters listen to the radio so he can monitor the train movements. So, of course, they know who is there. The plan that day was to teach Don Bowles how to do these operational tests. Because he was a new employee, or a new manager, and he hadn't done them. So that's the whole purpose of the test. And when we look at what happened here, we have a train master who's sending a text message while waiting at a banner over a radio that includes that, hey, we've set a tough one up for the employee who we are testing. Do we pull him out of service? And, oh, well. He set it up in what he believes to be the sharpest curve with the person who would know, the other supervisor. And this is a test that is inherently going to disrupt operations. The whole reason they had been telling him you need to start going faster is because it's a production job. And they're going to talk about, can I pull an employee out of service mid-shift? The district court gets it wrong when they say he waited to the end of the shift. The record shows that they pulled him out 20 minutes after the banner test. He's deserted his testing. Would it be enough that he didn't know beforehand who it was going to be? Hold on. Okay. Then he figures it out later and he's happy. When does he say this? When does he say, can I pull him out? He says he can pull him out 30 minutes beforehand in a text message. Okay. So that's before he knows who it is or not?  Before he does the test. And y'all have the video. You see him rolling. Is it before he's decided to do the test? Before what? It's not before he decided to do the test. Right? So it's after that, obviously. Oh, yes. The test is set up. It's a tough test. Yeah. Yeah. So my question is this. He could be happy to know who it is after the fact. Right. That doesn't mean, though, that he necessarily picked him beforehand. And it's our position that the evidence supports that he was both happy and not surprised. Because he knew what he was doing. Okay. We understand your case, Mr. Birch. And we'll be in recess until tomorrow. All rise.